# United States District Court
# Central District of California

| | |
|---|---|
| LUIS LOMELI, individually and on behalf of a class of similarly situated individuals,<br><br>Plaintiff,<br><br>v.<br><br>JACKSON HEWITT, INC.; TAX SERVICES OF AMERICA, INC. d/b/a JACKSON HEWITT TAX SERVICE; JJF & AC, INC. d/b/a Guanajuato Insurance Agency and Jackson Hewitt Tax Service; JUAN FLORES, an individual; and DOES 1-50, inclusive,<br><br>Defendants. | Case № 2:17-CV-02899-ODW (KSx)<br><br>**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS [60]; AND DENYING DEFENDANTS' MOTION TO STRIKE, AS MOOT [61]** |

## I. INTRODUCTION

Plaintiff Luis Lomeli brings this putative class action on behalf of himself and others similarly situated against Defendants Juan Flores, JJF & AC, Inc., Jackson Hewitt, Inc. ("JH, Inc."), and Tax Services of America, Inc. ("TSA").[1] (*See generally* First Amended Complaint ("FAC"), ECF No. 56.) Lomeli alleges claims against Defendants for: 1) violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c), 1962(d); 2) negligence; 3) fraud; 4) violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et*

---

[1] The Court refers to all defendants collectively as "Defendants."

*seq.*; 5) violation of California Business and Professions Code § 17530.5; and 6) violation of the California Consumer Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.* (*Id.*)  Lomeli also brings a claim on behalf of a California subclass for violation of the California Consumer Records Act, but only as against JH, Inc., TSA, and JJF & AC, Inc. (*Id.* ¶¶ 115–21.)

JH, Inc. and TSA move to dismiss the FAC because: 1) each cause of action is grounded in fraud, but Lomeli does not meet the requirements of Federal Rule of Civil Procedure 9(b); and 2) for each cause of action Lomeli fails to allege facts sufficient to state a claim for relief under Rule 8.  (*See generally* Mot., ECF No. 60.)  JH, Inc. and TSA assert other arguments for dismissal in their motion, which the Court declines to address for the reasons below.

JH, Inc. and TSA also move to strike the class allegations in the FAC.  (Mot. to Strike, ECF No. 61.)  JH, Inc. and TSA also filed a motion to compel arbitration, which they withdrew on September 18, 2017.  (ECF No. 66.)

## II. FACTUAL BACKGROUND[2]

JH, Inc. and TSA, one of JH, Inc.'s subsidiaries, operate a tax preparation business.  (FAC ¶¶ 9–10.)  Juan Flores controls JJF & AC, Inc., and operates a Jackson Hewitt location in South Gate, California, which is a franchise of the Jackson Hewitt enterprise.  (*Id.* ¶¶ 12, 14.)  Lomeli claims that Defendants manipulated several of his tax returns, and submitted them to the Internal Revenue Service ("IRS") without his consent.  (*Id.* ¶¶ 18–45.)

### A. Lomeli's 2014 Tax Return

In 2015, Lomeli visited the South Gate location of a Jackson Hewitt franchise, which he claims was owned and operated by Defendants.  (*Id.* ¶ 18.)  Lomeli paid an

---

[2] All factual references are allegations taken from Lomeli's FAC and accepted as true for purposes of this Motion.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Lomeli references "relevant documents" in his Opposition that were attached to Defendants' withdrawn Motion to Compel Arbitration.  (*See* Opp'n 1.)  The Court does not consider these documents in its analysis on this motion to dismiss.  *See Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 925 (9th Cir. 2001).

advance fee for his tax preparation, and was assigned Flores as his tax preparer. (*Id.*) After reviewing his documentation, "Jackson Hewitt[3]" determined that [Lomeli] neither owed any further taxes nor was owed any refund." (*Id.* ¶ 19.) Lomeli later received a letter from Defendants stating that his 2014 tax return was completed, and had been submitted. (*Id.* ¶ 20.) Unbeknownst to Lomeli, Defendants submitted a different tax return, which contained over $100,000 in wage-related expenses, which caused the IRS to determine Lomeli was entitled to a refund of $5,393. (*Id.* ¶¶ 21–22.) Lomeli was not aware of this change, and did not collect the tax refund. (*Id.* ¶ 23.)

Instead, Defendants enrolled Lomeli in an "Assisted Refund" program, under which Defendants opened a bank account for Lomeli, and directed the IRS to deposit his refund there. (*Id.*) Defendants then collected further fees from the refund amount, and "caused a cashier's check to be issued to [Lomeli] in the amount of $5,074.05." (*Id.*) Lomeli never received this check, or even knew it existed. (*Id.* ¶ 24.) He alleges, on information and belief, that Defendants forged his signature, and cashed the check. (*Id.*)

### B. Lomeli's 2015 Tax Return

The same thing occurred with Lomeli's 2015 return. Defendants advised Lomeli that he was entitled to a $56.00 refund, but that he would not receive it because of additional fees. (*Id.* ¶ 26.) After Lomeli authorized the filing of his return, Defendants filed a materially different return, including over $100,000 in unauthorized wage-related expenses, which caused the IRS to issue a refund of $6,514. (*Id.* ¶¶ 27–28.) Defendants again caused the refund to be deposited into a bank account Lomeli did not know existed, deducted additional fees, forged Lomeli's signature, and cashed his refund check, totaling $6,210.05, after fees. (*Id.* ¶¶ 28–30.)

---

[3] In this portion of the FAC, Lomeli defines "Jackson Hewitt" to include all defendants. (FAC ¶ 18.) In paragraphs fourteen through seventeen, he defines "Jackson Hewitt" to include JH, Inc. and/or TSA. (FAC ¶ 14.) This presents problems, as discussed below.

### C. Lomeli's 2016 Tax Return

Still unaware of what had occurred in prior years, Lomeli returned to the South Gate Jackson Hewitt location in 2017 to prepare his 2016 tax return. (*Id.* ¶ 31.) Flores again prepared his returns. (*Id.*) This year, Lomeli was entitled to a refund of $4,523, but Defendants did not advise him that he would receive his refund through the "Assisted Refund" program, or that additional fees would be deducted. (*Id.* ¶ 32.) On March 1, 2017, Lomeli received a cashier's check for $4,228.05 from Civista Bank, which was approximately $300 less than what he expected to receive. (*Id.* ¶ 33.) This was also the first time Lomeli learned that an account had been opened for him at Civista Bank, or that Defendants had changed the contents of his 2014 and 2015 returns. (*Id.* ¶¶ 33, 36.) After checking the IRS transcripts, Lomeli learned that the 2016 return Defendants submitted on his behalf was inflated, which resulted in an additional $85 refund. (*Id.* ¶ 34.) This is also how he learned of the inflated returns from the prior years. (*Id.* ¶ 36.)

### D. Defendants' Fraudulent Representations

Lomeli claims that Defendants "repeatedly and systematically" told him and the putative class members that they could count on Defendants "to accurately prepare tax returns." (*Id.* ¶ 37.) For example, Defendants ran an advertising campaign explaining the "Preparer's Pledge," which represented, and guaranteed, 100% accuracy:



(*Id.* ¶ 38.) In 2015, David Prokupek, Jackson Hewitt's CEO, stated: "We know our stuff. We've seen it all, and you can trust us to get your taxes done right—from the simple to the complex with 100% accuracy guaranteed." (*Id.* ¶ 39.) Another

advertisement made representations that Jackson Hewitt cared more about customer's privacy than the average "mom and pop" tax preparer. (*Id.* ¶ 45.) Lomeli alleges that Defendants had received "thousands of complaints that tax returns it had prepared were inaccurate," and that some of those complaints were based on the fraudulent scheme that Lomeli fell victim to. (*Id.* ¶ 44.)

### E. JH, Inc.'s & TSA's Alleged Control over Flores & JJF & AC, Inc.

JH, Inc. and TSA had the right to and exerted control over their franchisees, including the location owned and operated by JJF & AC, Inc. and Flores. (*Id.* ¶¶ 14–17.) JH, Inc. and TSA's franchise agreement provides them with the right to control several aspects of their franchisee's businesses. (*Id.* ¶ 15.) Specifically, any franchise "'is governed by a Franchise Agreement and must be operated in accordance with [Jackson Hewitt's] plan and system for preparing, checking and electronically filing income tax returns using our software, accounting methods, merchandising, equipment selection, advertising, promotional techniques, personnel training and quality standards….'" (*Id.* (presumably quoting the franchise agreement, although the agreement is not attached to Lomeli's FAC).) Lomeli lists several examples demonstrating that JH, Inc. and TSA retain the right to control their franchises, including, but not limited to, allegations that:

- franchisees must "'operate [their] business in full compliance with all our rules, specifications, standards and procedures, including, but not limited to, the Operating System, Operating Standards, Technology Standards and Marks Standards and any other requirements found in the Manual and any other materials [Jackson Hewitt] provides'" (*Id.* ¶ 17(a.));
- franchisees must "'furnish, equip and upgrade [their] offices in accordance with the rules, specifications, and standards contained in the Manual'" as developed by Jackson Hewitt (*Id.* ¶ 17(c.));
- franchisees may not conduct any "'advertising, promotional, [or] marketing activities'" without Jackson Hewitt's "'prior written

approval….'" Further, even if Jackson Hewitt approves a particular advertisement, it can revoke that approval at any time, in which case a franchisee "'must discontinue their use promptly'" (*Id.* ¶ 17(d.));

- franchisees "'must offer' all of the products and services designated by Jackson Hewitt, [and] may no longer offer a product if Jackson Hewitt discontinues it or revokes its approval.'" JH, Inc. and TSA also set prices for franchisees' products and services (*Id.* ¶¶ 17(l.), 17(m));
- JH, Inc. and TSA may coerce compliance with the rules by imposing fines on franchisees (*Id.* ¶ 17(b.));
- JH, Inc. and TSA reserve the absolute right to use any marketing material developed by a franchisee without payment (*Id.* ¶ 17(e.));
- JH, Inc. and TSA must "review and approve" the location of a franchisee's business (*Id.* ¶ 17(f.));
- JH, Inc. and TSA provide franchisees an operating manual containing "'the required policies, procedures, and rules for the operation' of a Jackson Hewitt franchise. Jackson Hewitt reserves the right to change this Manual at any time, thereby forcing a change in the manner in which franchisees operate their business'" (*Id.* ¶ 17(h.));
- JH, Inc. and TSA require that all franchisees must use their tax preparation software, and that use of any other software is forbidden absent Jackson Hewitt's "prior written consent." (*Id.* ¶ 17(i.)).

### F. Lomeli's Proposed Classes

Lomeli proposes two putative nationwide classes, with each also having a California subclass. (*Id.* ¶¶ 46–47.) Lomeli's first proposed class, entitled the "Manipulated Return" class, includes: "All persons in the United States and its territories who had their tax returns prepared by Jackson Hewitt in which Defendants artificially created a refund by manipulating the tax return without the taxpayer's consent." (*Id.* ¶ 46.) The "Undisclosed Fees" class includes: "All persons in the

United States and its territories who had their tax returns prepared by Jackson Hewitt and from whom Defendants charged undisclosed fees as part of the 'Assisted Refund' program." (*Id.*)

### III. LEGAL STANDARD

#### A. Motion to Dismiss

A motion to dismiss under either Rule 12(c) or 12(b)(6) is proper where the plaintiff fails to allege a cognizable legal theory or where there is an absence of sufficient facts alleged under a cognizable legal theory. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Shroyer v. New Cingular Wireless Serv., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010). That is, the complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).

Accusations of fraud require a heightened particularity in pleading. *See* Fed. R. Civ. P. 9(b). Federal Rule of Civil Procedure 9(b) establishes that an allegation of "fraud or mistake must state with particularity the circumstances constituting fraud." The "circumstances" required by Rule 9(b) are the "who, what, when, when, where, and how" of the fraudulent activity. *Cafasso, ex rel. U.S. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011). In addition, the allegation "must set forth what is false or misleading about a statement, and why it is false." *Id.* This heightened pleading standard ensures that "allegations of fraud are specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Semegen v. Weidner*, 780 F.2d 727, 731 (9th Cir. 1985).

Generally, a court should freely give leave to amend a complaint that has been dismissed, even if not requested by the party. *See* Fed. R. Civ. P. 15(a); *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (en banc). However, a court may deny leave to amend when it "determines that the allegation of other facts consistent with

7

the challenged pleading could not possibly cure the deficiency." *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986).

### B. Motion to Strike

Federal Rule of Civil Procedure 12(f) provides that "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." The court must view the pleadings in the light most favorable to the non-moving party. *In re 2TheMart.com Sec. Litig.*, 114 F. Supp. 2d 955, 965 (C.D. Cal. 2000). The Court has discretion to grant a motion to strike. *Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1528 (9th Cir. 1993), *rev'd on other grounds sub nom. Fogerty v. Fantasy, Inc.*, 510 U.S. 517 (1994).

## IV. DISCUSSION

### A. Lomeli Does Not Sufficiently Plead Agency or Fraud

JH, Inc. and TSA move to dismiss the entire FAC because it does not allege fraud with particularity, as required by Federal Rule of Civil Procedure 9(b). (Mot. 4–9.) Lomeli's allegations of fraud rely largely on his claim that JJF & AC, Inc. and Flores, as franchisees, were acting as the agents of JH, Inc. and TSA in perpetrating their scheme to defraud customers into unknowingly obtaining tax refunds, which they would never receive. (*See* FAC ¶¶ 14–36.) While unclear from the FAC, Lomeli also contends that JH, Inc. and TSA committed fraud independently. (Opp'n 5–6, ECF No. 64.)

#### a. Vicarious Liability

"[W]here a plaintiff alleges that a defendant is liable for fraud under an agency theory, Rule 9(b) requires that the existence of the agency relationship be pled with particularity." *Jackson v. Fischer*, 931 F. Supp. 2d 1049, 1061 (N.D. Cal. 2013). In the context of a franchisor-franchisee relationship, an agency relationship exists where the franchisor retains the "right of complete or substantial control over the franchisee…." *Cislaw v. Southland Corp.*, 4 Cal. App. 4th 1248, 1288 (1992). The FAC alleges that JH, Inc. and TSA had control over advertising and marketing (FAC

¶ 17(d)–(e)), the location of franchises (*id.* ¶ 17(f), (k)), the use of particular equipment and tax preparation software (*id.* ¶ 17(i)–(j)), and the products and pricing. (*Id.* ¶ 17(l)–(m).)

Lomeli contends that, unlike the plaintiff in *Cislaw v. Southland Corp.*, he sufficiently pleads agency. (Opp'n 7.) In *Cislaw*, on appeal from a summary judgment, the court held that there were no triable facts giving rise to a potential agency relationship where the franchise agreement gave the franchisees the right to control: 1) all employment decisions; 2) the products the franchisee would sell; 3) the vendors the franchisee would patronize; and 4) the decision to sell the product that the plaintiffs alleged killed their son, clove cigarettes. *Cislaw*, 4 Cal. App. 4th at 1295–96. The Court held these facts did not establish the requisite control over the franchisee's day-to-day operations required to hold the franchisor liable for the acts of the franchisee's employees. *Id.* at 1296–97.

More recently, in *Patterson v. Domino's Pizza, LLC*, the California Supreme Court held that "a franchisor…becomes potentially liable for actions of the franchisee's employees, only if it has retained or assumed a general right of control over factors such as hiring, direction, supervision, discipline, discharge, and relevant day-to-day aspects of the workplace behavior of the franchisee's employees." 60 Cal. 4th 474, 497–98 (2014). In *Patterson*, an employee of the franchisee location harassed the plaintiff, and the plaintiff sought to hold the franchisor vicariously liable. *Id.* at 477. The court analyzed the franchisor-franchisee relationship and noted a large number of controls the franchisor exerted over the franchisee, including: 1) a "Managers [sic] Reference Guide," which prescribed detailed standards and procedures, *id.* at 478, 484; 2) a "comprehensive sales and accounting program that Domino's required franchisees to buy and use in their stores," *id.* at 482 n.2; and 3) the fact that the franchisee always felt compelled to say "yes" to the franchisor regarding suggestions for change in the operation of the franchisee's business. *Id.* at 485. Despite these extensive controls, the court held that "Domino's had no right or

duty to control employment or personnel matters for [the franchisee]. …Domino's lacked contractual authority to manage the behavior of [the franchisee's] employees while performing their jobs, including any acts that might involve sexual harassment." *Id.* at 501.

Lomeli does not allege the requisite degree of control in the day-to-day operations of JJF & AC, Inc. because he does not allege any degree of control over the hiring, firing, or fraudulent conduct of the employee who is the allegedly bad actor—Flores. His allegations surround marketing, and other business-plan type controls, which are typical to a franchise agreement. *See id.* Lomeli alleges that the franchise must comply with certain "Operating Standards, Technology Standards and Marks Standards," as provided by the franchisors (FAC ¶ 17(a.)), but does not explain how those standards would have any effect on the hiring, direction, supervision, discipline, or discharge of franchise employees, like Flores, who prepared Lomeli's taxes. For example, Lomeli does not allege the standards incentivize franchisees to hire fraudulent tax preparers by, for instance, failing to dictate background checks or other protective hiring measures to ensure accurate reporting, or that JH, Inc. and TSA were directly involved in hiring Flores or franchise employees like him. These are the types of control over the day-to-day hiring and operations that *might* result in an agency finding as it pertains to the fraudulent conduct alleged here. As alleged by Lomeli, JH, Inc. and TSA had nothing to do with vetting or hiring Flores, and, if he did, it is not alleged with particularity in the FAC because of allegations styled as against "Jackson Hewitt," as defined to mean all defendants. (*See* FAC ¶ 18.)

The Court acknowledges that Lomeli alleges JH, Inc. and TSA controlled "personnel training and quality standards…." (FAC ¶ 15.) In *Patterson*, the franchisor provided new employees with operation materials, which mainly addressed pizza-making, store operations, and safety and security. *Patterson*, 60 Cal. 4th at 501. In addressing these similar facts, the Court focused on the franchisor's lack of control when it came to training regarding sexual harassment—the harm alleged by the

plaintiff. *Id.* Here, Lomeli does not allege that JH, Inc. or TSA instructed, or otherwise controlled employees, such as Flores, in a way that required or allowed manipulating tax returns to include unauthorized write-offs. Lomeli's allegations that the franchisees were required to use specific software in preparing the taxes are not enough because Lomeli does not allege that it was the software, which franchisees were required to use, that caused the manipulated the returns.

Lomeli relies on *People v. JTH Tax, Inc.*, which upheld the trial court's limited agency finding under a substantial evidence standard of review. 212 Cal. App. 4th 1219, 1247 (2013). On review after a bench trial, the California Court of Appeal analyzed the trial court's holding that, "[e]ven if Liberty's franchisees are not its agents for all purposes, they are its agents at a minimum for purposes of advertising." *Id.* The appeals court analyzed whether a franchisor could be vicariously liable for the illegal advertising of its franchisee. *See id.* at 1240. In affirming the trial court's finding of an agency relationship, the court explained that the franchisor admitted that it had control over the franchisee's advertisements, which were the allegedly illegal conduct, for reasons other than just protecting its intellectual property. *Id.* at 1246–47 ("In other words, Liberty acknowledges that it controlled [advertising] matters at least in part because it was 'good for business.'"). Here, while JH, Inc. and TSA may have control over the franchisee's advertisements (FAC ¶ 17(d.), (e.)), the conduct complained of is the filing of fraudulent tax returns and charging of undisclosed fees, which relates directly to the actions of franchisee employees, in this case, Flores. The control JH, Inc. and TSA have over the franchisee, as alleged by Lomeli, does not rise to the complete or substantial control of the instrumentality of harm that is required. *See Patterson*, 60 Cal. 4th at 497–98; *see also Salazar v. McDonald's Corp.*, Case No. 14-cv-02096-RS, 2016 WL 4394165, at *4–5 (N.D. Cal. Aug. 16, 2016) (discussing and applying *Patterson*, and finding franchisor not vicariously liable for acts of franchisee's employees).

11

Lomeli claims he also pleads apparent agency because "JH, Inc. and TSA strove to 'separate themselves from the mom and pops' by emphasizing the unity of their enterprise, franchisees and all." (Opp'n 10.) But he provides no authority for the proposition that these statements would establish an apparent agency relationship, and the Court declines to find it for him.

### b. Direct Allegations of Fraud

As pointed out by JH, Inc. and TSA, when addressing the agency allegations, Lomeli first defines "Jackson Hewitt" only to include JH, Inc. and TSA (*id.* ¶ 14), yet when addressing the substantive preparation and filing of the manipulated tax returns and the undisclosed fees, he defines "Jackson Hewitt" to include all defendants. (*Id.* ¶ 18.) Lomeli contends that JH, Inc. and TSA's arguments all relate to whether Lomeli alleged the "who" of his fraud-based claims with particularity. (Opp'n 4.)

"To comply with Rule 9(b), allegations of fraud must be specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (quoting *Bly–Magee v. California*, 236 F. 3d 1014, 1019 (9th Cir. 2001)). "[T]here is no absolute requirement that where several defendants are sued in connection with an alleged fraudulent scheme, the complaint must identify *false* statements made by each and every defendant." *Id.* (emphasis in original). On the other hand, as JH, Inc. and TSA argue, the plaintiff may not simply lump all defendants together, without any differentiation as to each defendant's alleged role in the fraudulent scheme. *Id.* Courts traditionally are more lenient in evaluating particularity where the factual details of the inner-workings of a fraudulent scheme are only known to the defendants. *See Wool v. Tandem Computs., Inc.*, 818 F. 2d 1433, 1439 (9th Cir. 1987), *overruled on other grounds by Hollinger v. Titan Capital Corp.*, 914 F. 2d 1564, 1575 (9th Cir. 1990) (en banc).

In arguing that he particularly alleged the "who" for his claims sounding in fraud, Lomeli explains: "Defendant Flores, who was the Jackson Hewitt representative for Plaintiff in each of the relevant years, is in control of and an agent of Defendant JJF & AC, Inc. …. As such, those two were in turn agents of Defendants JH, Inc. and TSA, Inc." (Opp'n 5.) Given the Court's finding on Lomeli's agency allegations, this is not sufficient.

When it comes to direct allegations of fraud against JH, Inc. and TSA, Lomeli impermissibly lumps all defendants together. *Destfino v. Reiswig*, 630 F. 3d 952, 958 (9th Cir. 2011) (quoting *Cisneros v. Instant Capital Funding Grp., Inc.*, 466 F.3d 558, 607 (E.D. Cal. 2009) ("Rule 9(b) does not allow a complaint to…lump multiple defendants together but require[s] plaintiffs to differentiate their allegations when suing more than one defendant.") If Lomeli contends that JH, Inc. and TSA operated with knowledge that Flores and JJF & AC, Inc. were manipulating tax returns and collecting undisclosed fees, then he should state that. However, that is not what Lomeli alleges; instead, he claims that "Jackson Hewitt," defined as all the defendants, acted in concert in manipulating, and submitting, the fraudulent tax returns, and collecting the undisclosed fees. (*See, e.g.*, FAC ¶¶ 18–21, 24, 30, 82.) Lomeli alleges that all Defendants opened the undisclosed bank account, forged his signature on cashier's checks, and charged him undisclosed fees. (*Id.*) The only statements he attributes to a particular individual related to the franchisor entities are statements from the CEO, David Prokupek, regarding "Jackson Hewitt's" 100% accuracy guarantee. (*Id.* ¶ 39.) The remaining allegations regarding fraudulent representations concern "Jackson Hewitt's" website and advertisements. (*Id.* ¶¶ 40–45.) JH, Inc. and TSA are entitled to know whether the claim is that they are vicariously liable, acted with knowledge of their purported agents' fraudulent acts, or that they actively participated in the scheme, and, if so, how they did so in any way different from Flores. *See Destfino*, 630 F. 3d at 958; *see also In re GlenFed, Inc. Sec. Litig.*, 42 F. 3d 1541, 1554 (9th Cir. 1994), *superseded by statute on other*

*grounds, as stated in Johnson v. Wal-Mart Stores, Inc.*, 554 F. App'x 696, 698 (9th Cir. 2013). Further, to the extent this nationwide scheme was perpetuated by JH, Inc. and TSA, there are no allegations that any fraudulent conduct occurred at any franchise location other than the one controlled by Flores.

"The policy supporting Rule 9(b)'s heightened pleading requirements is that it 'protects potential defendants—especially professionals whose reputations in their field of expertise are most sensitive to slander—from the harm that comes from being charged with the commission of fraudulent acts.'" *Collazo v. Wen by Chaz Dean, Inc.*, No. 2:15-CV-01974-ODW-AGR, 2015 WL 4398559, at *6 (C.D. Cal. July 17, 2015) (quoting *Semegen v. Weidner*, 780 F.2d 727, 731 (9th Cir. 1985)). It also "prevents the filing of a complaint as a pretext for the discovery of unknown wrongs…." *Semegen*, 780 F.2d at 731. Here, Lomeli's allegations against JH, Inc. and TSA are hollow—everything alleged is dependent on the acts of Flores and JJF & AC, Inc., as franchisees, and to the extent Lomeli alleges fraudulent conduct against "Jackson Hewitt," he has not particularized who specifically among the four defendants acted fraudulently. *See Destfino*, 630 F.3d at 958.

Lomeli's reliance on this Court's ruling in *Collazo v. Wen by Chaz Dean, Inc.*, is misplaced. In *Collazo*, the Court noted that plaintiff had met the heightened pleading burden in alleging that defendants acted "'jointly' in the design, manufacture, marketing, sale, and distribution of [hair] products," which damaged users' hair. *Collazo*, 2015 WL 4398559, at *6. The Court reasoned in that case that the policy behind Rule 9(b)'s heightened pleading requirement—to protect potential defendants from slander when accused of fraudulent acts—was not obstructed because the allegations against the defendants were "pedestrian," and did not place defendants at any increased risk of reputational harm. *Id.* Here, Lomeli alleges a nationwide scheme of tax fraud, which caused the filing of manipulated tax returns and undisclosed fees, for "hundreds, if not thousands, of [class] members." (FAC ¶ 48.) Lomeli also claims Defendants knew of "thousands of complaints that tax returns

[they] had prepared were inaccurate," but did nothing. (*Id.* ¶ 44.) JH, Inc. and TSA's business is tax preparation, and the potential for reputational harm here is great. Rule 9(b) demands more from Lomeli, given the potential consequences of this action. Lomeli needs to allege facts that, taken as true, establish that what occurred here was more than simply a rogue franchisee employee acting without knowledge or assistance from JH, Inc. or TSA as franchisors.

Lomeli relies on the rule from *Wool*, which relaxes the heightened pleading requirements "as to matters peculiarly within the opposing party's knowledge," and in cases where the corporate fraud is conveyed in group-published materials. *Wool*, 818 F.2d at 1439–40. Lomeli points to advertisements, which he contends are fraudulent group-published materials allowing group allegations of fraud, but he ignores the rule from *Wool* that "[i]n such cases, the particularity requirement may be satisfied *if the allegations are accompanied by a statement of the facts upon which the belief is founded.*" *Id.* at 1439 (quotations and citations omitted) (emphasis added); *see also Webb v. Carter's, Inc.*, No. CV 08-07367 GAF (MANx), 2009 WL 10670244, at *6 (C.D. Cal. June 23, 2009). Lomeli does not provide a statement of facts supporting his belief that JH, Inc. and TSA were complicit in, or actively perpetrated fraud. All of Lomeli's allegations surround his experiences at the South Gate Jackson Hewitt franchise location, which he then characterizes as allegations against "Jackson Hewitt." (FAC ¶¶ 18–36.) Accordingly, the Court **GRANTS** JH, Inc. and TSA's Motion to Dismiss.[4]

---

[4] JH, Inc. and TSA advance several other arguments as to why certain claims in the FAC should be dismissed. However, the Court declines to address these arguments at this time given that the Court finds Lomeli has not met his burden under Rule 9(b), and will provide him leave to amend. The Court further admonishes the parties that they are required to *substantively* meet and confer prior to filing a motion, pursuant to Local Rule 7-3. Despite JH, Inc. and TSA's affirmation in their moving papers that they did meet and confer, in their Reply, JH, Inc. and TSA withdrew several arguments that were "clarified" in Lomeli's Opposition. (*See, e.g.*, Reply 7 n.2, ECF No. 67.) The purpose of the meet and confer is to address the lack of clarity *before* spending the time, money, and judicial resources associated with motion practice. The Court reminds the parties of their obligations under Local Rule 7-3 to the extent further motion practice is necessary.

### B. Lomeli May Amend

A court should freely give leave to amend a complaint that has been dismissed, even if not requested by the party. *See* Fed. R. Civ. P. 15(a); *Lopez,* 203 F.3d at 1130. Here, the Court grants Lomeli leave to amend. Lomeli may be able to meet the requirements of Rule 9(b) under either of his theories of liability to the extent that he parses his allegations out as to each of Defendant's role in the fraudulent scheme, adequately alleges an agency relationship, or provides statements of fact supporting his group allegations of fraud. Should Lomeli wish to file an amended complaint, he must do so within twenty-one days of the date of this Order.

### C. Motion to Strike

JH, Inc. and TSA also filed a Motion to Strike the class allegations in Lomeli's FAC. (ECF No. 61.) While the Court foresees several issues with Lomeli's class allegations, it declines to rule on JH, Inc. and TSA's Motion to Strike at this juncture, and **DENIES** it, as **MOOT**, in light of the Court's ruling on the Motion to Dismiss.

### V. CONCLUSION

For the reasons discussed above, the Court **GRANTS** JH, Inc. and TSA's Motion to Dismiss, with leave to amend. Should Lomeli wish to file an amended complaint, he must do so within twenty-one days of the date of this Order. He must also lodge with the Court, and serve on the defendants, a redlined copy of the amended pleading so that the Court can decipher the amendments to his complaint.

**IT IS SO ORDERED.**

October 19, 2017

_____
**OTIS D. WRIGHT, II
UNITED STATES DISTRICT JUDGE**