# United States District Court
# Central District of California

| | |
|---|---|
| LUIS LOMELI, individually and on behalf of a class of similarly situated individuals,<br><br>Plaintiff,<br><br>v.<br><br>JACKSON HEWITT, INC.; TAX SERVICES OF AMERICA, INC. d/b/a JACKSON HEWITT TAX SERVICE; JJF & AC, INC. d/b/a Guanajuato Insurance Agency and Jackson Hewitt Tax Service; JUAN FLORES, an individual; and DOES 1-50, inclusive,<br><br>Defendants. | Case № 2:17-CV-02899-ODW (KSx)<br><br>**ORDER GRANTING, IN PART, AND DENYING, IN PART, DEFENDANTS' MOTION TO DISMISS [74]; AND DENYING MOTION TO STRIKE [76]** |

## I.    INTRODUCTION

Death and taxes are certain, but is a guarantee of 100% accuracy?  Plaintiff Luis Lomeli claims that he and the absent class members he seeks to represent were defrauded by Defendants, who guaranteed 100% accurate tax returns, but didn't deliver on their promise.

Defendants Juan Flores and JJF & AC, Inc. operated a franchise location, under a franchise agreement with Jackson Hewitt, Inc. ("JH, Inc."), and Tax Services of

America, Inc. ("TSA").[1]  (*See generally* Second Amended Complaint ("SAC"), ECF No. 73.)  On October 19, 2017, the Court granted Jackson Hewitt's Motion to Dismiss Lomeli's First Amended Complaint with leave to amend because he failed to parse out allegations against each defendant specifically, and did not satisfy Rule 9(b)'s heightened pleading standard.  (Order, ECF No. 70.)

Lomeli alleges claims against Defendants for: 1) violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c), 1962(d); 2) negligence; 3) fraud; 4) violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq.*; 5) violation of California Business and Professions Code § 17530.5; 6) violation of the California Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750, *et seq.*; and 7) violation of the California Customer Records Act, Cal. Civ. Code § 1798.80.  (*See generally* SAC.)

Jackson Hewitt moves to dismiss the SAC because: 1) each cause of action is grounded in fraud, but Lomeli does not meet the requirements of Federal Rule of Civil Procedure 9(b); and 2) for each cause of action Lomeli fails to allege facts sufficient to state a claim for relief under Rule 8.  (*See generally* Mot., ECF No. 74.)  Jackson Hewitt asserts other arguments for dismissal in its motion, which the Court details below.

Jackson Hewitt also moves to strike the class allegations in the SAC.  (Mot. to Strike, ECF No. 76.)[2]

## II.   FACTUAL BACKGROUND[3]

The Court set forth the factual background of this class action at length in its Order granting Jackson Hewitt's first Motion to Dismiss, and incorporates that discussion here by reference.  (Order 2–7, ECF No. 70.)

---

[1] The Court refers to all defendants collectively as "Defendants," and to JH, Inc. and TSA together, as "Jackson Hewitt."

[2] After considering the papers filed in connection with the Motions, the Court deemed the matter appropriate for decision without oral argument.  Fed. R. Civ. P. 78(b); C.D. Cal. L.R. 7-15.

[3] All factual references are allegations taken from Lomeli's SAC and accepted as true for purposes of this Motion.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Generally, Lomeli alleges that Jackson Hewitt is: 1) directly liable for fraudulent statements it made to consumers like Lomeli regarding the accuracy of its tax preparation services; and 2) vicariously liable for fraud and other derivative claims for its franchisee's actions in preparing fraudulent tax returns, given Jackson Hewitt's level of control over its franchisees. All of Lomeli's claims spawn from the fraudulent preparation and submission of his 2014, 2015 and 2016 tax returns, which he claims: 1) included additional expenses that were claimed without his approval and after his authorization to file a prior non-fraudulent tax return, resulting in an unwarranted, fraudulent tax refund; and 2) his enrollment in an "Assisted Refund" program that charged him additional fees without his approval.

### A. New Agency Allegations

Lomeli adds significant allegations regarding Jackson Hewitt's relationship with Flores and JJF & AC, Inc., and parses his allegations to identify each defendant's alleged role in the scheme. In addition to the controls set forth in the Court's prior Order, Lomeli alleges that Jackson Hewitt:

- "exercised direct control over employees of its franchisees, including hiring, direction, supervision, discipline, or discharge of franchisee employees" (SAC ¶ 19);
- required franchisee employees to take a "Tax Preparer Readiness Test," and forbade franchisees from employing individuals who didn't complete its training modules or the test (*Id.* ¶¶ 21–22);
- required franchisees to certify that their employees complied with Jackson Hewitt's directives, including training regarding "fraudulent tax returns and use of the software to prepare tax returns…and programs to 'ensure quality and prevent tax fraud'" (*Id.* ¶ 24);
- retained "specific control over training related to tax fraud, including fraud by tax preparers," which was included in its training materials (*Id.* ¶ 25);

- required franchisees to perform multi-level background checks on employees, which required the employee to meet thresholds of security dictated by Jackson Hewitt (*Id.* ¶ 26);

- tracked franchisee employees and the returns they worked on through unique identifiers (*Id.* ¶ 28);

- distributed a "Tax Preparation Compliance Manual," which "outline[d] Jackson Hewitt's control over fraud prevention training, including training to prevent tax preparer fraud and express guidelines for implementing that training" (*Id.* ¶ 29);

- provided a "Code of Conduct" that "refer[ed] to the reader as an employee of Jackson Hewitt," not the specific franchisee (*Id.* ¶ 31);

- "set[] forth the grounds wherein franchisees must terminate employees," and operated a program known as the "Red Flag Report," which "track[ed] tax return filing trends" to identify "a questionable tax situation (i.e. fraud)" (*Id.* ¶¶ 33–34); and

- required franchisees to appoint a "Tax Return Compliance Designee," who would report directly to Jackson Hewitt's Chief Tax Compliance Officer ("CTCO"). (*Id.* ¶ 35.)

The CTCO could require corrective actions if the Tax Return Compliance Designee failed to adequately address "tax return preparation concerns." (*Id.*) At the franchise location in question, Flores was the Tax Return Compliance Designee, and was directly supervised by Jackson Hewitt's CTCO. (*Id.* ¶¶ 35–38.)

Jackson Hewitt also controlled the software used by its franchisees to prepare tax returns, and did not permit franchisees to use any other software. (*Id.* ¶ 40.) When a franchisee completed preparing a return, they had to submit it through Jackson Hewitt's system, which would perform an "error check." (*Id.*) "Moreover, Jackson Hewitt retained complete and total control over the process of submitting tax returns to the relevant government entities, as it reviewed and approved each return that was prepared by its franchisees before it was filed." (*Id.* ¶ 42.)

## B.    Lomeli's Tax Returns

As described above, Lomeli claims that Flores, as Jackson Hewitt's agent and with its acquiescence, accepted one return for filing, but then changed deductions in the return to procure an unwarranted, fraudulent tax refund that the IRS issued to Lomeli without his knowledge or approval.

For Lomeli's 2014 tax return, he claims that after providing documentation to Flores, he received a letter "bearing Jackson Hewitt letterhead stat[ing] that Plaintiff's 2014 income tax return 'ha[d] been completed and filed electronically with the IRS at the IRS Submission Processing Center.'"  (*Id.* ¶ 45.)  Unbeknownst to him, however, and after approving a prior version of the tax return,

> Flores prepared *another* tax return for Plaintiff using the software and electronic systems controlled by Jackson Hewitt.  Even though a tax return for Plaintiff with markedly different information had been submitted for the same tax year just days before, Jackson Hewitt approved of the submission of this return and caused it to be transmitted to the IRS, again using the software and electronic systems controlled by Jackson Hewitt.

(*Id.* ¶ 46 (emphasis added).)  Flores similarly prepared duplicate, fraudulent returns in 2015 and 2016, which were submitted through Jackson Hewitt's system.  (*Id.* ¶¶ 53, 60.)

Lomeli did not collect the fraudulent refunds for tax years 2014 and 2015 because he didn't know about them.  (*Id.* ¶¶ 50, 57.)  He only discovered the fraud after receiving a cashier's check from "an account at Civista Bank in the amount of $4,228.05—nearly $300 less than the refund amount Defendant Flores informed Plaintiff he was due."  (*Id.* ¶ 61.)  This was also the first time he learned that a bank account was opened in his name, and discovered that Jackson Hewitt had withdrawn several fees from his refund amount, without his consent.  (*Id.* ¶ 62.)

### C. Defendants' Fraudulent Representations

Lomeli claims that Defendants "repeatedly and systematically" told him and the putative class members that they could count on Defendants "to accurately prepare tax returns." (*Id.* ¶ 65.) For example, Defendants ran an advertising campaign explaining the "Preparer's Pledge," which represented, and guaranteed, 100% accuracy:



(*Id.* ¶ 66.) In 2015, David Prokupek, Jackson Hewitt's CEO, stated: "We know our stuff. We've seen it all, and you can trust us to get your taxes done right—from the simple to the complex with 100% accuracy guaranteed." (*Id.* ¶ 67.) Another advertisement made representations that Jackson Hewitt cared more about customer's privacy than the average "mom and pop" tax preparer. (*Id.* ¶ 73.) Lomeli alleges that Defendants had received "thousands of complaints that tax returns it had prepared were inaccurate," and that some of those complaints were based on the fraudulent scheme that Lomeli fell victim to. (*Id.* ¶ 72.)

### D. Lomeli's Revised Proposed Classes

Lomeli proposes two putative nationwide classes, with each also having a California subclass. (*Id.* ¶¶ 74–75.) Lomeli's first proposed class, entitled the "Manipulated Return" class, includes: "All persons in the United States and its territories who had their tax returns prepared by Jackson Hewitt, including any of its franchisees, whose tax returns were submitted to the relevant government entities in a different form than approved by the taxpayer." (*Id.* ¶ 74.) The "Undisclosed Fees" class includes: "All persons in the United States and its territories who had their tax

returns prepared by Jackson Hewitt and/or any of its franchisees and who did not enroll in but were charged fees as part of the 'Assisted Refund' program.'" (*Id.*)

### III. LEGAL STANDARD

#### A. Motion to Dismiss

A motion to dismiss under either Rule 12(c) or 12(b)(6) is proper where the plaintiff fails to allege a cognizable legal theory or where there is an absence of sufficient facts alleged under a cognizable legal theory. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Shroyer v. New Cingular Wireless Serv., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010). That is, the complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).

Accusations of fraud require a heightened particularity in pleading. *See* Fed. R. Civ. P. 9(b). Federal Rule of Civil Procedure 9(b) establishes that an allegation of "fraud or mistake must state with particularity the circumstances constituting fraud." The "circumstances" required by Rule 9(b) are the "who, what, when, when, where, and how" of the fraudulent activity. *Cafasso, ex rel. U.S. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011). In addition, the allegation "must set forth what is false or misleading about a statement, and why it is false." *Id.* This heightened pleading standard ensures that "allegations of fraud are specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Semegen v. Weidner*, 780 F.2d 727, 731 (9th Cir. 1985).

Generally, a court should freely give leave to amend a complaint that has been dismissed, even if not requested by the party. *See* Fed. R. Civ. P. 15(a); *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (en banc). However, a court may deny leave to amend when it "determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986).

**B.     Motion to Strike**

Federal Rule of Civil Procedure 12(f) provides that "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." The court must view the pleadings in the light most favorable to the non-moving party. *In re 2TheMart.com Sec. Litig.*, 114 F. Supp. 2d 955, 965 (C.D. Cal. 2000). The Court has discretion to grant a motion to strike. *Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1528 (9th Cir. 1993), *rev'd on other grounds sub nom. Fogerty v. Fantasy, Inc.*, 510 U.S. 517 (1994).

## IV.     DISCUSSION

The Court previously dismissed Lomeli's FAC because he failed to particularly plead his fraud-based claims. (Order 8–15, ECF No. 70.) In the SAC, Lomeli proffers additional facts, but the same two theories of fraud: direct liability and vicarious liability.

**A.     Direct Allegations of Fraud**

Lomeli alleges Jackson Hewitt is directly liable for fraud because: 1) they reviewed and approved tax returns, which they knew were fraudulent; and 2) they wrote a letter to Lomeli telling him that the return he authorized for filing was sent to the IRS processing center, when, in fact, Jackson Hewitt sent a different return to the IRS. (Opp'n 3–6, ECF No. 77.)

"To comply with Rule 9(b), allegations of fraud must be specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (quoting *Bly–Magee v. California*, 236 F.3d 1014, 1019 (9th Cir. 2001)). "[T]here is no absolute requirement that where several defendants are sued in connection with an alleged fraudulent scheme, the complaint must identify *false* statements made by each and every defendant." *Id.* (emphasis in original). On the other hand, as JH, Inc. and TSA argue, the plaintiff may not simply lump all defendants together, without any

differentiation as to each defendant's alleged role in the fraudulent scheme. *Id.* Courts traditionally are more lenient in evaluating particularity where the factual details of the inner-workings of a fraudulent scheme are only known to the defendants. *See Wool v. Tandem Computs., Inc.*, 818 F. 2d 1433, 1439 (9th Cir. 1987), *overruled on other grounds by Hollinger v. Titan Capital Corp.*, 914 F. 2d 1564, 1575 (9th Cir. 1990) (en banc).

### 1. Review & Approval of Returns

Jackson Hewitt argues that the SAC falls into the same trap the Court prohibited in its previous Order; namely, lumping all Defendants together instead of parsing out the allegations as to each defendant. Lomeli, however, goes farther than the generalized allegations from the First Amended Complaint. He now alleges that Jackson Hewitt knew of the fraudulent scheme because on each occasion, Flores prepared two versions of Lomeli's return, "using the software and electronic systems controlled by Jackson Hewitt." (SAC ¶¶ 46, 53, 60.) He further alleges that "[e]ven though a tax return for Plaintiff with markedly different information had been submitted for the same tax year just days before, Jackson Hewitt approved of the submission of this return and caused it to be transmitted to the IRS," again using its software. (*Id.*) These are direct allegations establishing Jackson Hewitt's alleged involvement in the fraudulent scheme, and explaining its role.

Lomeli argues that he is not required to particularly plead Jackson Hewitt's state of mind because that is information particularly within its control. *See Concha v. London*, 62 F.3d 1493, 1503 (9th Cir. 1995) (quotations omitted) ("Plaintiffs may fairly be expected to identify with specificity the defendant's alleged misrepresentations, though they are not expected to plead with specificity the defendant's state of mind."). Before, the Court took issue with Lomeli's failure to specifically identify the grounds for his belief that Jackson Hewitt acted with the intent to defraud. (Order 15, ECF No. 70.) Now, Lomeli explains how the circumstances surrounding the submission of his fraudulently-prepared tax returns

would lead a reasonable person to suspect fraud was afoot. (*See* Opp'n 4; SAC ¶¶ 45–48, 53–54;) *see Wool*, 818 F.2d at 1439 (holding that where plaintiff likely does not have personal knowledge of corporate fraudulent intent, "the particularity requirement may be satisfied if the allegations are accompanied by a statement of the facts upon which the belief is founded."). Jackson Hewitt received, and approved, multiple returns for the same person, for the same year, which included significantly different amounts of wage-related expenses claimed. (*Id.*) This allegation paired with Jackson Hewitt's assurances of 100% accuracy, and a system that separates it from the "mom and pop" tax preparers raises an eyebrow. (SAC ¶¶ 63–73.) While at this point Lomeli may not know the inner workings of Jackson Hewitt's software and review systems, which "track tax return filing trends" to identify "a questionable tax situation," the circumstances surrounding the submission of his returns are pleaded with particularity, and lead the Court to reasonably infer a fraudulent intent—at least at this stage. (*Id.* ¶¶ 28, 34–36, 39–42.) Whether Lomeli's allegations will bear fruit is a question the Court will undoubtedly be asked to decide after discovery.

### 2. Affirmative Statements

As before, Lomeli points to Defendants' following affirmative statements as constituting fraud: Jackson Hewitt advertisements touting 100% accurate returns; comparisons to mom and pop tax preparers; and the Jackson Hewitt "preparer's pledge" to handle customer's tax returns like their own. In some form, all of these advertisements lured consumers, like Lomeli, to believe that Jackson Hewitt was looking out for them. (SAC ¶¶ 65–73.) Jackson Hewitt contends that this claim should fail because Lomeli never alleges that he relied on the statements, and does not allege that Jackson Hewitt knew the statements were false when made. (Mot. 5.)

Lomeli is required to plead justifiable reliance on Jackson Hewitt's representations. *Gil v. Bank of Am., Nat'l Ass'n*, 138 Cal. App. 4th 1371, 1381 (2006). He does so by alleging that the "representations were material because they induced Plaintiff and class members to entrust preparation and submission of their tax

returns to Defendants" (SAC ¶ 109) and that class members "acted in justifiable reliance on Defendants' misrepresentations and omissions by permitting Defendants to prepare and file their tax returns." (*Id.* ¶¶ 112, 162.) Jackson Hewitt discounts these allegations as legal conclusions. (Mot. 5 (citing *W. Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981).) Reading the SAC as a whole, these allegations are sufficient. Indeed, the purpose of the advertisements was to engender trust in potential consumers, like Lomeli, such that they would hire Jackson Hewitt, and its franchisees, to prepare their taxes. Jackson Hewitt cannot convince consumers that they are better than a "mom and pop" tax preparer, guarantee 100% accuracy, and then turn tail when someone actually relies on those statements. With respect to knowledge of falsity, Lomeli alleges that "Jackson Hewitt received thousands of complaints that tax returns it had prepared were inaccurate," at least in part because of the manipulation of tax returns described here. (SAC ¶ 72.) Accordingly, Lomeli's advertisement theory is sufficient at this stage.

Lomeli also relies on a letter addressed to him, and dated April 15, 2015, "bearing Jackson Hewitt letterhead stat[ing] that Plaintiff's 2014 income tax return 'ha[d] been completed and filed electronically with the IRS at the IRS Submission Processing Center.'" (SAC ¶ 45.) This statement was false at the time because the return that Jackson Hewitt submitted to the IRS was materially different—it included fake deductions leading to an undeserved tax refund. (*Id.* ¶¶ 45–47, 108, 111.) First, Jackson Hewitt argues that Lomeli fails to specifically state "who wrote the letter, that it was final, that it was sent or by whom, or that Lomeli saw or relied on it." (Reply 3, ECF No. 80.) While the Court agrees that a letter bearing the Jackson Hewitt letterhead does not necessarily prove that Jackson Hewitt, as opposed to its franchisee, sent the letter, at this juncture, the allegation is sufficient. Jackson Hewitt should move for summary judgment in the event the evidence does not support Lomeli's allegations. With regard to reliance, a reasonable inference from the facts pleaded is that Lomeli relied on the letter from his tax preparer, which assured him that the tax

return he approved had been submitted to the IRS. What else would he do with the letter? In conclusion, Lomeli's allegations read together, and taken as true, are sufficient to allege a theory of direct fraud against Jackson Hewitt—whether he will be able to prove them is a question for a different day.

## B. Vicarious Liability

The Court previously held that Lomeli had not met his burden to plead the level of control required to establish the vicarious liability of a franchisor. (Order 8–12, ECF No. 70.) In his previous complaint, Lomeli alleged a level of control by Jackson Hewitt that was consistent with its purpose as a franchisor: to protect its intellectual property, and brand. Lomeli now alleges additional controls over the processing, and submission of tax returns—which directly relates to the fraudulent conduct of which Lomeli complains.

The Court addressed *Patterson v. Domino's Pizza, LLC*, in its previous Order, but it must drill deeper than the crust in evaluating Lomeli's new allegations. As detailed above, he claims that Jackson Hewitt "exercised direct control over employees of its franchisees, including hiring, direction, supervision, discipline, or discharge of franchisee employees." (SAC ¶ 19.) And, he alleges various specific ways that Jackson Hewitt exercised its control. (*Id.* ¶¶ 21–36.) Jackson Hewitt controlled Flores, who was JJF & AC, Inc.'s Tax Return Compliance Designee, by requiring him to report directly to, and be supervised by, Jackson Hewitt's CTCO. (SAC ¶¶ 35–36.) These newly alleged facts are sufficient to plead a vicarious liability theory. *See Patterson v. Domino's Pizza, LLC*, 60 Cal.4th 474, 501–04 (2014).

In *Patterson*, the Supreme Court of California held that the Domino's franchisor could not be held vicariously liable for the sexual harassment of a franchisee employee who was harassed by another franchisee employee. *Id.* at 503. There, the franchise agreement specifically said that employees of the franchisee "shall be [franchisee's] employees, and not [franchisor's] agents or employees." *Id.* at 482. The franchisee hired the plaintiff on the spot, without any input or vetting by the

franchisor. *Id.* This franchise arrangement is different than the one Lomeli alleges. Here, Lomeli alleges that Jackson Hewitt "exercised direct control over employees of its franchisees, including hiring, direction, supervision, discipline, or discharge of franchisee employees," and referred to the readers of its "Code of Conduct" as the employees of Jackson Hewitt. (SAC ¶¶ 19, 31.) It also required franchisee employees to go through a background check, and participate in training programs developed by Jackson Hewitt, which were specifically designed to prevent the type of harm alleged by Lomeli—preparation of fraudulent tax returns. (*Id.* ¶¶ 21–34.) Jackson Hewitt set specific parameters where the franchisee would be required to terminate its employees for failure to comply with the franchisor's requirements. (*Id.* ¶¶ 21–34.) In contrast, in *Patterson*, the franchisor could not intervene to address the harm alleged, sexual harassment. 60 Cal.4th at 479 ("Nothing contractually required or allowed the franchisor to intrude on [the process of addressing sexual harassment allegations].") Similarly, despite the franchisor suggesting that the harasser should be fired, the franchisee chose instead to suspend the offender, pending an investigation. *Id.* at 479 ("The uncontradicted evidence showed that the franchisee imposed discipline consistent with his own personnel policies, declined to follow the ad hoc advice of the franchisor's representative, and neither expected nor sustained any sanction for doing so."). Furthermore, there was no evidence that the Domino's franchisor acquiesced in the sexual harassment, or played any role in allowing it to occur. *See generally id.*

The difference between *Patterson* and this case is that Lomeli alleges that Jackson Hewitt controlled the instrumentality that caused his harm—the hiring and training of tax preparers, who then fraudulently prepared his returns and opened a bank account in his name without consent. (SAC ¶¶ 19–42.) He also alleges that Jackson Hewitt reviewed, approved, and submitted the tax returns to the IRS through its proprietary, and mandatory, computer systems. (*Id.*) Had the harm alleged in *Patterson* resulted from the way Domino's *pizza* was prepared—an aspect of the franchisee's business that the franchisor did control—the court's conclusion likely

would have been different. *Compare Patterson*, 60 Cal.4th at 501 ("Domino's lacked contractual authority to manage the behavior of [the franchisee's] employees while performing their jobs, including any acts that might involve sexual harassment."), *with* (SAC ¶ 25 ("Jackson Hewitt assumed specific control over training related to tax fraud, including fraud by tax preparers.").) The control alleged by Lomeli directly affects the consumer in a way the control in *Patterson* did not.

Jackson Hewitt argues that the franchisee in *Patterson* was also controlled, at least to a certain extent, by the franchisor because the franchisee testified that he felt "he had little choice but to follow the advice of his area leader," and "assumed that a franchisee who did not 'play ball'" would be in trouble. (Reply 6 (citing *Patterson*, 60 Cal.4th at 485).) However, when it came down to the specific conduct leading to the *Patterson* plaintiff's complaint—sexual harassment—the franchisee chose to suspend the harasser, despite the franchisor's representative suggesting that the franchisee fire him. *Patterson*, 60 Cal.4th at 479. The Court acknowledges that at least some of the instrumentalities that Jackson Hewitt allegedly controlled, such as its Red Flag program, were designed to *prevent* fraud. However, this argument does not detract from Lomeli's claim that Jackson Hewitt retained a level of control sufficient to hold it vicariously liable for its franchisee's actions. The adequacy of its controls is a trait that may be relevant in evaluating whether Jackson Hewitt is directly liable.

Ultimately, Jackson Hewitt may be able to prove that it lacked sufficient control to warrant vicarious liability, but at this juncture, the Court is limited to Lomeli's allegations, which differ enough from those addressed in *Patterson* that the Court finds he alleges a viable theory of vicarious liability. Accordingly, the Court **DENIES** Jackson Hewitt's Motion on these grounds.[4]

---

[4] Jackson Hewitt requests that the Court take judicial notice of a Statement of Information filed by JJF & AC, Inc. with the Secretary of State. (Req. for Jud. Not., ECF No. 75.) The filing purports to demonstrate that Adriana Casillas is JJF & AC, Inc.'s Chief Executive Officer, not Flores. (Mot. 12 n.6.) The Court declines to take judicial notice of the truth of the facts stated in the filing, and, in any event, finds that Lomeli sufficiently alleges his vicarious liability theory without needing to rely on Flores' corporate status in JJF & AC, Inc.

### C. Lomeli May Plead Equitable Claims in the Alternative & Has Standing for an Injunction

Jackson Hewitt also moves to dismiss Lomeli's fifth, sixth, eleventh, and thirteenth claims because they are equitable, and thus not available in light of Lomeli's viable claims for damages. (Mot. 13–15.) Lomeli contends that he may plead in the alternative, and the Court agrees. *Adkins v. Comcast Corp.*, No. 16-CV-05969-VC, 2017 WL 3491973, at *3 (N.D. Cal. Aug. 1, 2017) ("[T]his Court is aware of no basis in California or federal law for prohibiting the plaintiffs from pursuing their equitable claims in the alternative to legal remedies at the pleadings stage."). To the extent Lomeli establishes his claims for damages, he will not be permitted to also pursue equitable relief. For now, however, he may pursue both theories.

Next, Jackson Hewitt argues Lomeli does not have standing for injunctive relief because there is no realistic threat of a repeated violation of his rights because he did not allege he will return to Jackson Hewitt. (Mot. 15.) Lomeli argues that he is entitled to injunctive relief because, even if he does not allege that he will patronize Jackson Hewitt in the future, he requests other injunctive relief, such as resubmission of the correct tax returns, and an explanation to the government of how the returns were filed. (Opp'n 16.) Lomeli also argues that the threat of future harm exists because Jackson Hewitt already has his information, and has used it once to manipulate his tax returns. At this stage, Lomeli sufficiently alleges standing. *See Chester v. TJX Companies, Inc.*, No. 5:15-cv-01437, 2016 WL 4414768, at *8 (discussing application of standing doctrine for injunctive relief in context of consumer protection statutes).

### D. RICO Violations

To state a RICO claim, "a plaintiff must allege '(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'" *Odom v. Microsoft Corp.*, 486 F.3d 541, 547 (9th Cir. 2007) (quoting *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985)). A plaintiff must allege an "enterprise," which must be a distinct

entity from the defendant, and cannot be "simply the same 'person' referred to by a different name." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 158 (2001). The enterprise must also share a common purpose. *Shaw v. Nissan N. Am., Inc.*, 220 F. Supp. 3d 1046, 1054 (C.D. Cal. 2016). Whether the common purpose must be fraudulent is still unclear in the Ninth Circuit. *Id.*

As urged by Jackson Hewitt, the majority of courts require that the common purpose be distinct from the enterprise's or member's primary business activities. *Shaw*, 220 F. Supp. 3d at 1056–57; *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prod. Liab. Litig.*, 826 F. Supp. 2d 1180, 1202 (C.D. Cal. 2011) ("Indeed, the SAC alleges no more than that Defendants' primary business activity—the design, manufacture, and sale or lease of Toyota vehicles—was conducted fraudulently"); *In re Jamster Mktg. Litig.*, No. 05CV0819 JM (CAB), 2009 WL 1456632, at *5 (S.D. Cal. May 22, 2009) ("The challenge for Plaintiffs is to set forth sufficient allegations to distinguish ordinary business conduct from fraudulent conduct."). The Court finds these cases persuasive and chooses to follow them.

Lomeli claims he alleges an enterprise because:
> Specific to JH and TSA, the SAC alleges that they reviewed and approved the relevant tax returns (SAC ¶¶ 44, 46–48, 52–55, 59–60), communicated false statements to Plaintiff (and class members) by falsely reporting that the approved return was filed when it was not (*id.* ¶ 45), and collected fees from the enterprise's operations. (*Id.* ¶¶ 49, 56, 62.)

(Opp'n 18.) However, all of these allegations surround the relationship of Jackson Hewitt and its franchisee, in furthering their primary business—processing tax returns. While Lomeli alleges that these acts were perpetrated fraudulently, that is not enough. *Shaw*, 220 F. Supp. 3d at 1056–57 (addressing cases and finding allegations of fraudulent perpetuation of primary business activities not sufficient to state a claim); *In re Toyota*, 826 F. Supp. 2d at 1202. Lomeli fails to adequately allege an enterprise aside from Defendants' primary businesses, and this is a necessary element of his claim.

As Lomeli concedes, his RICO conspiracy claim is dependent on his RICO claim. (Opp'n 20;) *Howard v. Am. Online, Inc.*, 208 F.3d 741, 751 (9th Cir. 2000) ("Plaintiffs cannot claim that a conspiracy to violate RICO existed if they do not adequately plead a substantive violation of RICO."). Accordingly, the Court **GRANTS** Jackson Hewitt's Motion to Dismiss Lomeli's first and second causes of action.

While leave to amend should be granted freely, where a court finds that no additional allegations consistent with those in the complaint could be plausibly pleaded, the court may dismiss without leave. *Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995). Here, the Court cannot fathom what facts Lomeli could plead that would take this alleged scheme outside of Jackson Hewitt and its franchisee's primary business activity of preparing and submitting tax returns, and for this reason, the Court denies leave to amend. *See Shaw*, 220 F. Supp. 3d at 1057.

### E. Jackson Hewitt's Fraud, UCL, and CLRA Arguments

Jackson Hewitt also argues that Lomeli's Fraud, CLRA, and UCL claims should be dismissed because they do not adequately plead that Jackson Hewitt knowingly made false statements or omissions, or that Lomeli relied on them. (Mot. 18–19.) These are the same arguments Jackson Hewitt advanced in arguing the Court should dismiss all of Lomeli's claims because they rely on an overarching theme of fraud, which also requires reliance and knowledge of falsity. For the same reasons addressed above, the Court **DENIES** Jackson Hewitt's Motion to Dismiss on these grounds. (SAC ¶¶ 45–47, 108, 111–12 (alleging "Jackson Hewitt" sent a letter stating that one particular tax return was filed when, in fact, a second, fraudulent return was filed, and that Lomeli and class members relied on Jackson Hewitt's misrepresentations).)

### F. Lomeli's Tax Information Disclosure Claims (Sixth & Thirteenth)

California Business & Professions Code section 17530.5 makes it a misdemeanor for any person or entity to disclose information obtained in the

preparation of someone's taxes except under certain, prescribed circumstances. Cal. Bus. & Prof. Code § 17530.5(a). "A disclosure prohibited by this section includes a disclosure made internally within the entity preparing or assisting in preparing the return for any purpose other than tax preparation or made by the entity to any of its subsidiaries or affiliates." *Id.* § 17530.5(c). Jackson Hewitt claims that Lomeli does not allege that it "disclosed" his tax information, only that Flores misused it. (Reply 11.) However, the statute covers disclosure of the information within the same organization, or between related entities, "for any purpose other than tax preparation." Cal. Bus. & Prof. Code § 17530.5(a). As described at length above, Lomeli alleges that Jackson Hewitt reviewed, approved and submitted a second, fraudulent tax return prepared by Flores, which is sufficient to make a claim for wrongful disclosure at this stage. (SAC ¶¶ 45–46, 53, 60.)

## G.    Negligence Claims (Third & Ninth)

Jackson Hewitt first argues Lomeli's negligence claims should be dismissed because they are completely at odds with his vicarious liability theory. (Mot. 20.) Lomeli's negligence theory relies on Jackson Hewitt's failure to implement adequate controls, such that it could identify and prevent fraudulent submission of its franchisee's customer's tax returns through its electronic systems. (*See, e.g.*, SAC ¶ 102.) Jackson Hewitt argues that allowing the negligence claims to stand under these circumstances "would create a 'darned if you do, darned if you don't' situation for franchisors…." (Mot. 20.)

What Jackson Hewitt fails to acknowledge is that Lomeli may plead in the alternative, and that contradictory allegations, at the pleading stage, do not warrant dismissal. Fed. R. Civ. P. 8(d)(3) ("A party may state as many separate claims or defenses as it has, regardless of consistency."); *see also Cisco v. Mullikin*, No. 4:11 CV 295 RWS, 2012 WL 549504, at *1 (E.D. Mo. Feb. 21, 2012) (allowing claims for respondeat superior and negligent supervision to survive motion to dismiss because pleading alternative, inconsistent theories is permitted). As this litigation progresses,

facts will be discovered, and they will either support Lomeli's theory of absolute control, or not. To the extent they do not, then perhaps they will support Lomeli's theory that Jackson Hewitt's controls, while not sufficient to establish vicarious liability, were such that it breached a duty it owed to the customers that it promised 100% accurate returns.

Jackson Hewitt also claims that Lomeli fails to allege the elements of a negligence claim. (Mot. 22.) However, Lomeli alleges: 1) Jackson Hewitt owed a general duty of due care, supported by its guarantee to consumers, like Lomeli, of a 100% accurate tax return (SAC ¶ 100); 2) that it breached that duty by "negligently failing to implement controls to detect and prevent the submission of fraudulent tax returns…" (*id.* ¶ 102); and 3) that Jackson Hewitt's breach proximately caused Lomeli's harm, and damages. (*Id.* ¶¶ 103–05.) Jackson Hewitt argues that it lacked control over Flores, whose criminal acts were really the cause of Lomeli's harm. (Mot. 22,.) This amounts to a proximate cause argument, which Jackson Hewitt may make at a later date. For now, Lomeli adequately pleaded his negligence claim as an alternate theory of liability. Accordingly, the Court **DENIES** Jackson Hewitt's Motion to Dismiss on these grounds.

### H. California Customer Records Act

The California Customer Records Act ("CRA") provides a private right of action where a business fails to "disclose a breach of the security of the system following discovery or notification of the breach…in the most expedient time possible and without unreasonable delay." Cal. Civ. Code § 1798.82. Jackson Hewitt argues that Lomeli fails to allege a data breach by an unauthorized person that would have required notice. (Mot. 23.) The statute protects consumers where their information "was, or is reasonably believed to have been, acquired by an unauthorized person…." Cal. Civ. Code § 1798.82(a). Here, Lomeli authorized Flores and Jackson Hewitt access to his personal information to prepare his tax returns. He complains not that the information was disclosed to an unauthorized person, but, rather, that the

*information* included in his tax returns was unauthorized. Jackson Hewitt then submitted the return to the government entity Lomeli originally intended to have it, the IRS. These allegations do not state a claim under the CRA.

A party must have standing to bring a claim under the CRA. *In re Adobe Sys., Inc. Priv. Litig.*, 66 F. Supp. 3d 1197, 1217–18 (N.D. Cal. 2014). Jackson Hewitt also argues that Lomeli fails to adequately allege he has standing because he only alleges harm that "may" occur in the future. (Mot. 23.) Lomeli responds that he suffered harm because, had Jackson Hewitt disclosed the data breach, he would not have returned on later occasions to prepare his taxes. (Opp'n 24.) While this may be true, it does not remedy the fact that he does not allege disclosure of his information to an unauthorized person. The Court cannot envision how Lomeli could amend his complaint to fix this defect given that Lomeli's theory of liability revolves entirely around his tax returns being fraudulently prepared, and submitted to the IRS, which was the intended recipient. Accordingly, the Court **GRANTS** Jackson Hewitt's Motion with respect to this claim without leave to amend.

## I. Motion to Strike Class Allegations

Jackson Hewitt also moves to strike Lomeli's class allegations. (Mot. to Strike, ECF No. 76.) While some courts strike class allegations where it is abundantly clear that the class mechanism will not work, it is the exception, not the rule. *Cholakyan v. Mercedes-Benz USA, LLC*, 796 F. Supp. 2d 1220, 1245–46 (C.D. Cal. 2011) (collecting cases) ("While defendant cites several cases for the proposition that class allegations can be stricken at the pleadings stage, it is in fact rare to do so in advance of a motion for class certification."). As noted before, the Court foresees problems at the class certification stage in light of the individual modes of proof that will likely be required, but declines to address those issues now, and without the benefit of discovery and briefing on the issue. *Id.* Accordingly, the Court **DENIES** Jackson Hewitt's Motion to Strike.

## V.    CONCLUSION

For the reasons discussed above, the Court **GRANTS, in part, and DENIES, in part,** Jackson Hewitt's Motion to Dismiss (ECF No. 74), and **DENIES** its Motion to Strike.  (ECF No. 76.)

**IT IS SO ORDERED.**

February 20, 2018

_____

**OTIS D. WRIGHT, II**
**UNITED STATES DISTRICT JUDGE**